**Phillip R. LANGSDON, et al., Plaintiffs,**

v.

**Riley DARNELL, et al., Defendants.**

**RURAL WEST TENNESSEE AFRICAN AMERICAN AFFAIRS COUNCIL, INC., et al., Plaintiffs,**

v.

**Don SUNDQUIST, Governor of the State of Tennessee, et al., Defendants.**

**Nos. 92–2415–TUV, 92–2407–TUV.**

United States District Court,
W.D. Tennessee,
Western Division.

July 9, 1998.

Bruce S. Kramer, Borod & Kramer, Memphis, TN, Laughlin McDonald, ACLU Foundation, Atlanta, GA, Richard Dinkins, Williams & Dinkins, Nashville, TN, Keenan R. Keller, Davis, Polk & Wardwell, New York City, for plaintiffs in No. 92–2407–TUV.

Michael W. Catalano, Associate Solicitor General, Office of Attorney General, Nashville, TN, for defendants in Nos. 92–2407–TUV, 92–2415–TUV.

John L. Ryder, Apperson, Crump, Memphis, TN, J. Robert Walker, III, Baker, Donelson, Bearman & Caldwell PC, Memphis, TN, Maclin P. Davis, Baker, Donelson, Bearman & Caldwell PC, Nashville, TN, for plaintiffs in No. 92–2415–TUV.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

TURNER, District Judge.

Plaintiffs in this consolidated civil rights action assert a claim of vote dilution pursuant to § 2 of the Voting Rights Act, 42 U.S.C. § 1973.[1] Specifically, the Rural West Tennessee African American Affairs Council and certain registered voters in Tennessee (the "Rural West plaintiffs"), along with Phillip R. Langsdon and other registered voters in Tennessee (the "Langsdon plaintiffs") charge that Tennessee's 1994 reapportionment of its ninety-nine state House districts unlawfully dilutes African–American voting strength in rural west Tennessee, a geographic area that includes Madison, Haywood, Hardeman, Tipton, Fayette, and Lauderdale Counties. On May 6, 1996, the Rural West plaintiffs filed a motion for summary judgment on their voting rights claim. In response to this motion, on June 19, 1996, the defendants filed cross-motions for summary judgment against both the Rural West plaintiffs and the Langsdon plaintiffs. Although the Langsdon plaintiffs have not moved for summary judgment on their voting rights claim, they have filed memoranda supporting the Rural West plaintiffs' motion and opposing the defendants' motions. For the reasons that follow, the court denies plaintiffs' and defendants' cross-motions for summary judgment.

### I. Background

In April of 1992, the Tennessee General Assembly passed Chapter 836 of the Acts of 1992 ("Chapter 836"), which reapportioned the state's single-member House of Representatives and Senate districts. Prior to the 1992 primaries, the Rural West and Langsdon plaintiffs filed lawsuits challenging Chapter 836's House and Senate reapportionment plans on the grounds that they violated the Equal Protection Clause of the Fourteenth Amendment and § 2 of the Voting Rights Act. On September 15, 1993, a three-judge panel of this court held that Chapter 836's House districting scheme was unconstitutional because it violated the "one person, one vote doctrine under the Equal Protection Clause." *Rural West Tennessee African–*

---

1. A violation of 42 U.S.C. § 1973 is established if:

   based on the totality of circumstances, it is shown that the political processes leading to nomination or election· in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subdivision (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

   42 U.S.C. § 1973(b).

*American Affairs Council v. McWherter,* 836 F.Supp. 447, 452 (W.D.Tenn.1993), *aff'd sub nom., Millsaps v. Langsdon,* 510 U.S. 1160, 114 S.Ct. 1183, 127 L.Ed.2d 534 (1994).

In November of 1993, the same three-judge panel ruled that Tennessee's "1992 Senate reapportionment plan violate[d] § 2 of the Voting Rights Act by affording black voters in west Tennessee less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Rural West Tennessee African–American Affairs Council, Inc. v. McWherter,* 836 F.Supp. 453, 466 (W.D.Tenn.1993) ("*Rural West I*"). The Supreme Court vacated and remanded the court's *Rural West I* decision, 512 U.S. 1248, 114 S.Ct. 2775, 129 L.Ed.2d 888 (1994), for further consideration in light of *Johnson v. De Grandy,* 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). On remand this court reversed its decision in *Rural West I* and held that the "1992 [Senate] Plan conform[ed] to the Voting Rights Act." *Rural West Tennessee African–American Affairs Council, Inc. v. McWherter,* 877 F.Supp. 1096, 1098 (W.D.Tenn.1995) ("*Rural West II*"), *aff'd sub nom., Rural West Tennessee African–American Affairs Council, Inc. v. Sundquist,* 516 U.S. 801, 116 S.Ct. 42, 133 L.Ed.2d 9 (1995).

While the *Langsdon* and *Rural West I* appeals were pending, the Tennessee General Assembly passed Chapter 536 of the Public Acts of 1994 ("Chapter 536"), which provides a three-part reapportionment plan for Tennessee's House of Representatives, consisting of Plan A and alternative Plans B and C.[2] Plan A creates 12 majority–African–American House districts, but places none in the six county area that plaintiffs describe as rural west Tennessee. Under the terms of Chapter 536, Plan B, which creates 13 majority–African–American House districts, includ-

ing one in rural west Tennessee, will take effect if this court finds that Plan A unlawfully dilutes minority voting strength.

On January 23, 1995, this court issued an order validating Chapter 536's Plan A after finding that it accorded with the one person, one vote requirement at issue in the prior *Langsdon* decision. This court further ordered that it would delay further consideration of Chapter 536's House plan until the Supreme Court ruled on appeals pending in the Senate case (*Rural West I* and *Rural West II*).

After the Supreme Court affirmed *Rural West II,* on January 25, 1996, the Rural West plaintiffs filed a second amended complaint challenging Plan A on the sole ground that it violates § 2 of the Voting Rights Act by diluting the voting power of blacks in Tennessee, including west Tennessee and rural west Tennessee.[3] Contending that *Rural West I* and *Rural West II* conclusively decided the facts necessary to prove that Plan A dilutes minority voting strength in rural west Tennessee, on May 6, 1996, the Rural West plaintiffs filed a motion for summary judgment on their § 2 dilution claim. In response, defendants filed cross-motions for summary judgment, similarly based on the court's prior findings, and specifically contend that: (1) Shelby County should be considered when the court engages in proportionality[4] analysis and (2) once Shelby County is included in the court's frame of reference, the number of majority–African–American districts is substantially proportional to the black voting age population's share of the total population in the relevant seven-county area.

On March 13, 1997, this court ordered the plaintiffs to advise the court whether their voting rights challenge included Shelby County. The court's March 13th order fur-

---

**2.** After the Supreme Court affirmed this court's ruling in *Millsaps v. Langsdon,* 510 U.S. 1160, 114 S.Ct. 1183, 127 L.Ed.2d 534 (1994), Plan C, which called for the reinstatement of the districting plan struck down in *Langsdon,* became moot.

**3.** Because the second amended complaint contained no constitutional claims, this court disbanded the three-judge court by order entered May 9, 1996.

**4.** Under the Voting Rights Act, proportionality is "defined as the relationship between the number of majority-minority voting districts and the minority group's share of the relevant population:...." *Johnson v. De Grandy,* 512 U.S. 997, 1025, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (O'Connor, J., concurring).

ther provided that if the Rural West plaintiffs were not challenging a seven-county area that included Shelby County, the defendants' motion for summary judgment would be moot and denied accordingly. On March 21, 1997, the Rural West plaintiffs responded to the court's March 13th order by advising that "their Motion for Summary Judgment, as well as their Second Amended Complaint are limited to a claim of vote dilution in the six-county region of Tennessee including, Fayette, Hardeman, Haywood, Lauderdale, Madison, and Tipton Counties." The black voting age population of this six-county area is 31.01%.[5] Of the five House districts that include this six-county area, none is majority-black.[6]

## II. Summary Judgment Standard

The moving party is entitled to summary judgment where there is no genuine issue of material fact and the party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court's function is not to weigh the evidence or judge its truth; rather, the court must determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law governing the case will determine what issues of fact are material. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir.1989).

A summary judgment movant "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden–Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir.1986). Once met, the burden shifts to the non-

moving party to set forth specific facts showing a genuine issue of triable fact. Fed. R.Civ.P. 56(e). To meet this burden, the non-movant must present sufficient countervailing evidence such that a jury could return a verdict favorable to the non-moving party. Anderson, 477 U.S. at 249–50, 106 S.Ct. 2505.

Where the parties have submitted cross-motions for summary judgment, the court addresses "each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Taft Broadcasting Co. v. United States, 929 F.2d 240, 248 (6th Cir.1991) (quoting Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed.Cir.1987)). Moreover, the fact that both parties have submitted motions for summary judgment does not require the court to find that no issue of material fact exists. Id. (citing Begnaud v. White, 170 F.2d 323, 327 (6th Cir.1948)). In short, "summary judgment in favor of either party is not proper if disputes remain as to material facts." Id. (citing Mingus, 812 F.2d at 1391).

## III. Elements of a Claim of Voting Strength Dilution

To meet their burden of production in this alleged § 2 violation, the plaintiffs must satisfy the following three pre-conditions:

[1] the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... [2] the minority group must be able to show that it is politically cohesive.... [and 3] the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.

---

5. See Pls.' Second Request for Judicial Notice (1990 Census Data), No. 92–2407, Docket Entry No. 29, at p. 2 (June 24, 1992) (hereinafter "Pls.' Second Request for Judicial Notice").

6. Under Plan A, five majority-white House districts include the six counties of rural west Tennessee in the following manner: House District 72 contains a substantial part of Madison County; House District 73 is located entirely within Madison County; House District 80 includes portions of Fayette and Hardeman Counties; House

District 81 includes part of Fayette County and all of Tipton County; and House District 82 includes part of Hardeman County and all of Haywood and Lauderdale Counties. See Notice of Filing Chapter 536 of the Public Acts of 1994 and Other Related Documents; District Statistics Report of Chapter 536 of the Public Acts of 1994, No. 92–2407, Docket Entry No. 129 (Jan. 25, 1994) (hereinafter "Notice of Filing Chapter 536").

*Cousin v. Sundquist,* 145 F.3d 818, 823 (6th Cir.1998) (quoting *Thornburg v. Gingles,* 478 U.S. 30, 51–51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1985)). Once the *Gingles* factors have been established, plaintiffs must still show that under the totality of the circumstances a violation of the Voting Rights Act has occurred. *See De Grandy,* 512 U.S. at 1010, 114 S.Ct. 2647 (explaining that following the satisfaction of the *Gingles* factors, the court's inquiry is not complete until the totality of circumstances has been considered).

### IV. *The Court's Frame of Reference*

When the court considers the statistical data necessary for analyzing their voting rights claim, plaintiffs argue that the court should limit its frame of reference to the six-county area of rural west Tennessee. Defendants, however, contend that in addition to using statewide statistics, the court should also employ data from a region that includes not only rural west Tennessee, but also Shelby County. A summary of the results produced by the 1994 House districting scheme provides a preview to the substantial effect that the court's frame of reference could have upon plaintiffs' claim of vote dilution.

### A. *The Outcome Determinative Nature of the Court's Frame of Reference*

Out of the ninety-nine House districts at the statewide level, twelve districts are majority black. Thus, at the statewide level, where black voters comprise 14.4%[7] of the voting-age population, substantial proportionality has been achieved, in that 12.12% of Tennessee's House districts are majority black. When one considers Tennessee's ten influence districts, i.e., a legislative district with a black voting-age population in excess of 25% but less than 55%, 22.2% of Tennessee's House districts are either majority-black or influence districts. *See Rural West II,* 877 F.Supp. at 1104–05 (holding that the presence of influence districts should be con-

sidered in the totality of the circumstances and adopting a standard rule for labeling an influence district). In *Rural West II,* the court concluded that Tennessee's Senate reapportionment plan, whose three majority-black districts and three influence districts comprised 18.2% of Tennessee's thirty-three Senate districts, did not violate the Voting Rights Act. Relying on the House plan's comparable 22.2% ratio of combined majority-black and influence districts to total House districts at the statewide level, defendants, for obvious reasons, seek to prevail on summary judgment by applying the *Rural West II* holding.

At the regional level, rural west Tennessee, which includes at least part of five House districts and contains a black voting age population of 31.01%, has no majority-black House district, but includes at least part of four influence districts, as such districts are defined by *Rural West II.*[8] However, once Shelby County is included in the regional analysis, the black voting-age population rises to 37.9%,[9] and the number of majority-black districts leaps to nine, making 42.85% of the 21.3 House districts in the seven-county area majority-black. Thus, considering the Supreme Court's decision in *De Grandy* and its progeny, a regional analysis that includes Shelby County essentially guarantees a defense victory on summary judgment. *See De Grandy,* 512 U.S. at 1014, 114 S.Ct. 2647 (emphasizing that substantial proportionality is not dispositive, but holding that where Hispanics constituted 47% of the voting-age population in Dade County, Florida and where 45% of the potential twenty House districts in Dade County were majority-Hispanic, substantial proportionality existed and precluded claim of vote dilution, despite the satisfaction of the *Gingles* factors and a history and legacy of discrimination in the area); *African American Voting Rights Legal Defense Fund. Inc. v. Villa,* 54 F.3d

---

**7.** *See Rural West II,* 877 F.Supp. at 1107 (explaining that African–Americans comprise 14.4% of Tennessee's voting age population).

**8.** House District 73 contains a black voting-age population of 37%; House District 80 contains a black voting-age population of 29%; House District 81 contains a black voting-age population of 29%; and House District 82 contains a black

voting age population of 41%. *See* Notice of Filing Chapter 536, *supra* note 6.

**9.** *See Rural West II,* 877 F.Supp. at 1110 (stating that the combined black voting age population of rural west Tennessee and Shelby County is 37.9%).

1345, 1353 (8th Cir.1995) (following *De Grandy* in a challenge to a city's districting scheme for alderman wards and affirming grant of summary judgment where percentage of black voting-age population was 42.7% and percentage of majority-black wards was 42.9%).

In short, if the court considers statewide statistics or includes Shelby County in its proportionality analysis for rural west Tennessee, the plaintiffs will not prevail on their vote dilution claim. If the court, however, limits its analysis exclusively to the six-county region challenged by plaintiffs, the absence of a single majority-black district warrants further inquiry into the equal opportunity of black voters in that area. Having considered the import of the court's frame of reference in the instant matter, the court turns to its rationale for limiting the relevant geographic scope to rural west Tennessee.

### B. *Limiting the Scope to Rural West Tennessee*

Although *De Grandy*, which focused solely on the apportionment of state legislative districts in Dade County, Florida, necessarily implies that plaintiffs may bring a voting rights challenge to a discrete political subdivision within a state, the Supreme Court declined to determine what frame of reference a court should employ when the parties to such a vote dilution lawsuit dispute the courts' appropriate geographic scope for relevant statistics. *See De Grandy*, 512 U.S. at 1022 ("Thus we have no occasion to decide which frame of reference should have been used if the parties had not apparently agreed in the District Court on the appropriate geographical scope for analyzing the alleged § 2 violation...."). As a result, despite *De Grandy*'s sole consideration of Dade County statistics, this court in *Rural West II* concluded that "[n]othing in *De Grandy*, however, prohibits a district court from considering statewide statistics, even if the proofs largely concentrate on a particular region of a state." *Rural West II*, 877 F.Supp. at 1109.[10] However, the court's frame of reference did not

affect the outcome in *Rural West II* due to the absence of vote dilution under either a statewide or regional geographic scope. *See id.* at 1110 ("In sum, a consideration of the seven-county region alone does not change the outcome of our decision today."). The *Rural West II* court simply did not confront the dilemma of potentially different results produced by different frames of reference. This court, therefore, is not confined by *Rural West II*'s decision to ground its rationale in statewide statistics.

After reconsidering *De Grandy*'s discussion of proportionality and after examining the Supreme Court's recent discussion of the proper understanding of a § 2 vote dilution claim in *Shaw v. Hunt*, 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) ("*Shaw II*"), this court reaches the conclusion that when plaintiffs bring a claim of vote dilution that is specific to a particular region, statewide proportionality statistics by themselves have limited probative value, in that they may obscure the fact that defendants are improperly using over-proportionality in one area of the state to offset vote dilution in the challenged region of the state. Likewise, when defendants attempt to add another county to plaintiffs' challenged region, as in the instant case, over-proportionality in the added county may again conceal dilution in the plaintiffs' challenged region. Accordingly, and for the further reasons discussed below, the court limits its frame of reference for determining whether Chapter 536 improperly dilutes the plaintiffs' voting strength to the six-county region of rural west Tennessee. The court finds substantial support for its decision from the following discussions in *Shaw II* and *De Grandy*.

After assuming that compliance with § 2 of the Voting Rights Act could be a compelling state interest, the *Shaw II* Court held that the North Carolina legislature's creation of District 12, a majority-black congressional district, could not satisfy strict scrutiny under the Fourteenth Amendment because it was not a narrowly tailored remedy. *Shaw II*, 116 S.Ct. at 1905. *Shaw II*'s rationale

---

**10.** Nevertheless, the *Rural West II* court recognized the importance of regional statistics when it stated "we believe that we should have evaluated more closely regional statistics in our earlier decision in addition to examining statewide evidence." *Rural West II*, 877 F.Supp. at 1109.

for rejecting District 12 as a narrowly tailored remedy is critical to this court's decision regarding the proper frame of reference in the instant matter:

Appellees do not defend District 12 by arguing that the district is geographically compact, however. Rather they contend, and a majority of the District Court agreed that once a legislature has a strong basis in evidence for concluding that a § 2 violation exists in the State, it may draw a majority-minority district anywhere, even if the district is in no way coincident with the compact *Gingles* district, as long as racially polarized voting exists where the district is ultimately drawn.

We find this position singularly unpersuasive. We do not see how a district so drawn would avoid § 2 liability. If a § 2 violation is proven for a particular area, it flows from the fact that individuals in this area "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *The vote dilution injuries suffered by these persons are not remedied by creating a safe majority-black district somewhere else in the State.* For example, if a geographically compact, cohesive minority population lives in south-central to southeastern North Carolina, as the Justice Department's objection letter suggested, District 12 which spans the Piedmont Crescent would not address that § 2 violation. The black voters of the south-central to southeastern region would still be suffering precisely the same injury that they suffered before District 12 was drawn. District 12 would not address the professed interest of relieving the vote dilution, much less be narrowly tailored to accomplish the goal.

Arguing, as appellees do and the District Court did, that the State may draw the district anywhere derives from a misconception of the vote-dilution claim. *To accept that the district may be placed anywhere implies that the claim, and hence*

*the coordinate right to an undiluted vote (to cast a ballot equal among voters), belongs to the minority as a group and not to its individual members. It does not.* *Id.* 116 S.Ct. at 1906 (internal citations omitted) (emphasis added). If, as the Supreme Court states in *Shaw II*, a regional vote dilution injury is not remedied by creating a majority-black district outside of the challenged area, then symmetry likewise requires that the presence or absence of vote dilution in a particular region of a state cannot be determined by looking to the statistics of another region of the same state, or solely to the state as a whole.

Additionally, the rationale behind *De Grandy*'s suspicion of using proportionality as a "safe harbor" for state districting schemes further supports this courts' conclusion that rural west Tennessee should be analyzed independently of Shelby County and statewide statistics. The *De Grandy* Court explained:

Even if the State's safe harbor were open only in cases of alleged dilution by the manipulation of district lines, however, *it would rest on an unexplored premise of highly suspect validity: that in any given voting jurisdiction (or portion of that jurisdiction under consideration), the rights of some minority voters under § 2 may be traded off against the rights of other members of the same minority class.* Under the State's view, the most blatant racial gerrymandering in half of a county's single member districts would be irrelevant under § 2 if offset by political gerrymandering in the other half, so long as proportionality wee the bottom line. *De Grandy,* 512 U.S. at 1019, 114 S.Ct. 2647 (emphasis added).

Although the African–American voting age population of Shelby County is 39.68%,[11] nine out of seventeen, or 52.94%, of the House districts in Shelby County are majority-black,[12] thereby exceeding proportionality in Shelby County. *Shaw II* and *De Grandy*

11. *See* Pls.' Second Request for Judicial Notice, *supra* note 5, at p. 2.

12. Shelby County includes House districts 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98 and 99. Districts 84, 85, 86, 87, 88, 90, 91, 92 and 98 contain majority-black voting age populations. *See* Notice of Filing Chapter 536, *supra* note 6.

guide this court to the conclusion that neither over-representation in Shelby County, nor substantial proportional representation at the statewide level should be used to compel an offset of potential vote dilution in rural west Tennessee generated by the absence of a majority-black district in that six-county area. *See Shaw II,* 512 U.S. at 1019, 114 S.Ct. 2647 ("A balanced bottom line does not foreclose proof of discrimination along the way.") (quoting *Baird v. Consolidated City of Indianapolis,* 976 F.2d 357, 359 (7th Cir. 1992)); *see also Marylanders for Fair Representation, Inc. v. Schaefer,* 849 F.Supp. 1022, 1049, 1064 (D.Md.1994) (considering plaintiffs' statewide voting rights claim independently from plaintiffs' regional voting rights claim and finding no violation with respect to statewide claim, while finding vote dilution with respect to a particular region of the state); *NAACP v. Austin,* 857 F.Supp. 560, 568 (E.D.Mich.1994) (citing *De Grandy* and concluding that "[t]he 'relevant population' to be used in determining proportionality depends, in each case, on the breadth of the allegations in the plaintiffs' complaint, and the geographic scope of the districts, if any, that are specifically challenged."). The court will therefore focus upon statistics specific to rural west Tennessee.

In an effort to keep Shelby County within the court's frame of reference, defendants initially contend that plaintiffs' inclusion of Shelby County in their second amended complaint precludes them from now narrowing their regional challenge.[13] Second, defendants intimate that by permitting the plaintiffs to define the court's frame of reference, the court has enabled the plaintiffs to continually carve out a smaller geographic area until they achieve a voting rights violation. For the following reasons, defendants' contentions are without merit.

In response to defendants' first argument, the court finds that defendants have suffered no prejudice from plaintiffs' decision to narrow their vote dilution challenge, because the specific references to "rural West Tennessee" in plaintiffs' second amended complaint notified defendants of a vote dilution challenge to rural west Tennessee.[14] Moreover, the contention that plaintiffs may not narrow the focus of their voting rights claim is contrary to voting rights case law. *See De Grandy,* 512 U.S. at 1021, 114 S.Ct. 2647 (acknowledging that the district court limited its scope to Dade County after the plaintiffs voluntarily dismissed their claims of Hispanic vote dilution outside the Dade County area); *Austin,* 857 F.Supp. at 569 n. 5 (limiting scope to Wayne and Oakland Counties after plaintiffs voluntarily dismissed their vote dilution claim with respect to Kent County). This court construes plaintiffs' March 21, 1997 advisement, which expressly limited their vote dilution claim to rural west Tennessee, as a legitimate voluntary dismissal of

---

**13.** Defendants reference the following allegations from plaintiffs' second amended complaint:

5. The personal plaintiffs reside in the seven-county area in West Tennessee—Fayette, Hardeman, Haywood, Lauderdale, Madison, Shelby, and Tipton—where new majority African–American legislative districts can be drawn.

31. African–Americans in Tennessee, including in West Tennessee, are politically cohesive, in that they tend to vote as a bloc, have common socio-economic characteristics and have organized themselves collectively for political activity.

32. Candidates for elective office preferred by African–Americans in Tennessee, including West Tennessee, are usually defeated by the white majority voting as a bloc.

40. African–Americans in Tennessee, including in West Tennessee and in rural West Tennessee, have less opportunity than other residents to participate in the political pro-

cesses and to elect candidates of their choice.

**14.** In addition to ¶ 40 of plaintiffs' second amended complaint, *supra* note 13, the following paragraphs from the same complaint also specifically reference rural west Tennessee:

37. The existing house redistricting in Tennessee, including in West Tennessee and in rural West Tennessee, was enacted and is being maintained purposefully to deny or abridge the right of African–Americans to vote and to participate in the political process on an equal basis with other residents of the jurisdiction on the basis of race and color.

45. The existing redistricting plan for the House of Representatives, including for West Tennessee and rural West Tennessee, results in the denial or abridgment of African–American voting strength in violation of plaintiffs' rights guaranteed by Section 2 of the Voting Rights Act.

plaintiffs' statewide and Shelby County vote dilution claims.

With respect to defendants' second argument, prior decisions show that the three *Gingles* preconditions operate to eliminate meritless claims and, thereby, check any concern that plaintiffs can continually narrow their challenged area until they achieve a vote dilution victory. *See, e.g., Askew v. City of Rome,* 127 F.3d 1355, 1381–85 (11th Cir. 1997) (affirming district court's finding of no vote dilution in the City of Rome, Georgia where plaintiffs failed to show that the white majority voted sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate); *Campos v. City of Houston,* 113 F.3d 544, 547–48 (5th Cir.1997) (affirming district courts' grant of summary judgment because Hispanic minority group was not sufficiently large and geographically compact to constitute a majority in a single-member district); *Reed v. Town of Babylon,* 914 F.Supp. 843, 867 (E.D.N.Y.1996) (finding no vote dilution due to plaintiffs' failure to satisfy *Gingles'* compactness requirement). The court therefore restricts the geographic scope of relevant statistical data to rural west Tennessee.

## V. *Cross–Motions for Summary Judgment*

■ As the court foreshadowed in its order of March 13, 1997, because defendants' grounded their motions for summary judgment solely upon the existence of proportionality at the statewide level and at a regional level inclusive of Shelby County, the court's decision to focus its inquiry on the six-county area of rural west Tennessee renders defendants' motion moot. Accordingly, the court turns its attention to the Rural West plaintiffs' motion for summary judgment.

■ Relying on collateral estoppel, plaintiffs argue that the court's prior findings in *Rural West I* and *Rural West II,*[15] regarding the satisfaction of the *Gingles* preconditions and several Senate Report factors, posture their present claim of vote dilution for

summary judgment. Considering that in *Rural West I* and *Rural West II* the plaintiffs' regional challenge to the Senate reapportionment plan included Shelby County, the preclusive effect of those decisions may be limited in this case where Shelby County is excluded from plaintiffs' regional challenge to the House districting scheme. *See Black v. Ryder/P.I.E. Nationwide, Inc.,* 15 F.3d 573, 583 (6th Cir.1994) ("[I]ssue preclusion, or collateral estoppel, dictates that once an issue is *actually* and *necessarily* determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on different causes of action involving any party to the prior litigation.") (emphasis added). To the extent the doctrine is applicable, however, collateral estoppel could only preclude any dispute that the *Gingles* factors and several Senate Report factors were satisfied in 1993, the last time the political environment of rural west Tennessee was judicially scrutinized. Since that time, two state legislative elections have been held, the details of which could arguably change the conclusions reached in *Rural West I* concerning the satisfaction of the *Gingles* requirements, or the presence or absence of factors relevant to the balancing of the totality of the circumstances. *See Uno v. City of Holyoke,* 72 F.3d 973, 990, 992 (1st Cir.1995) (finding that "[t]hough past elections may be probative of racially polarized voting, they become less so as environmental change occurs" and on remand allowing district court in its discretion to "permit the parties to supplement the record with additional facts (including, but not limited to, evidence gleaned from the new round of [elections] that have recently been completed)") (citations omitted); *Vecinos De Barrio Uno v. City of Holyoke,* 960 F.Supp. 515, 526 (D.Mass.1997) (reversing its earlier finding of vote dilution on remand and explaining "[g]iven the most recent election, the court must conclude that, in the context of Holyoke's hybrid ward and at-large voting system for the City Council, racially polarized voting as a cause of significantly dimin-

---

**15.** Although *Rural West II* reversed the holding of *Rural West I,* the *Rural West II* court, based on its earlier findings in *Rural West I,* concluded that the *Gingles* preconditions were still satisfied

for west Tennessee, a region that includes rural west Tennessee and Shelby County. *Rural West II,* 877 F.Supp. at 1099.

ished opportunity for [minority] voters has not been adequately proved to exist in the city's current political scene"). Because "ultimate conclusions about equality or inequality of opportunity [in voting] were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts," *De Grandy,* 512 U.S. at 1011, 114 S.Ct. 2647, the absence of a detailed analysis of rural west Tennessee's most recent state legislative elections compels the court to conclude that genuine issues of material fact remain and, therefore, plaintiffs are not entitled to judgment as a matter of law.

## VI. *Conclusion*

For the foregoing reasons, the court denies plaintiffs' and defendants' cross-motions for summary judgment.