RURAL WEST TENNESSEE AFRICAN AMERICAN AFFAIRS COUNCIL, INC., et al., Plaintiffs,

v.

Don SUNDQUIST, Governor of the State of Tennessee, et al., Defendants.

Phillip R. Langsdon, et al., Plaintiffs,

v.

Riley Darnell, et al., Defendants.

Nos. 92–2407–TUV, 92–2415–TUV.

United States District Court,
W.D. Tennessee,
Western Division.

Nov. 6, 1998.

Bruce S. Kramer, Borod & Kramer, Memphis, TN, Richard Dinkins, Williams & Dinkins, Nashville, TN, Kathleen L. Wilde, American Civil Liberties Union Foundation, Inc., Atlanta, GA, Laughlin McDonald, American Civil Liberties Union Foundation, Inc., Atlanta, GA, Neil Bradley, American Civil Liberties Union Foundation, Inc., Atlanta, GA, Mary Wycokoff, American Civil Liberties Union Foundation, Inc., Atlanta, GA, Keenan Renoldo Keller, Davis Polk & Wardwell, New York City, NY, Keenan R. Keller, The Advisory Board, Washington, DC, for Rural West Tennessee African–American Affairs Council, Inc., plaintiff.

Michael W. Catalano, Office of the Attorney General, Nashville, TN, for Ned McWherter, John Wilder, James Naifeh, Will Burns, Lenita McGraw, Janet Black, Judy Bishop, Ella Mae Esque, Spence Dupree, Bobby White, Linda Burnett, Don Sundquist, Brooks Thompson, defendants.

J. Robert Walker, III, Baker Donelson Bearman & Caldwell, Memphis, TN, John L. Ryder, Apperson Crump & Maxwell, Memphis, TN, Maclin P. Davis, Jr., Waller Lansden Dortch & Davis, Nashville, TN, for Phillip R. Langsdon, plaintiff.

John H. Reinbold, Office of the Attorney General, Nashville, TN, Michael W. Catalano, Office of the Attorney General, Nashville, TN, for Ned McWherter, defendant.

## ORDER

TURNER, District Judge.

Plaintiffs in this consolidated civil rights action assert a claim of vote dilution pursuant to § 2 of the Voting Rights Act, 42 U.S.C. § 1973.[1] Specifically, the Rural West Ten-

---

1. A violation of 42 U.S.C. § 1973 is established if:

   based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subdivision (a) in that its members have less opportunity than other members of the electorate to participate in the political

nessee African American Affairs Council and certain registered voters in Tennessee (the "Rural West plaintiffs"), along with Phillip R. Langsdon and other registered voters in Tennessee (the "Langsdon plaintiffs") charge that Tennessee's 1994 reapportionment of its ninety-nine state House districts unlawfully dilutes African–American voting strength in rural west Tennessee, a geographic area that includes Madison, Haywood, Hardeman, Tipton, Fayette, and Lauderdale Counties. For the following reasons, the court holds that the 1994 reapportionment violates § 2 of the Voting Rights Act.

### I. Background

In April of 1992, the Tennessee General Assembly passed Chapter 836 of the Acts of 1992 ("Chapter 836"), which reapportioned the state's single-member House of Representatives and Senate districts. Prior to the 1992 primaries, the Rural West and Langsdon plaintiffs filed lawsuits challenging Chapter 836's House and Senate reapportionment plans on the grounds that they violated the Equal Protection Clause of the Fourteenth Amendment and § 2 of the Voting Rights Act. On September 15, 1993, a three-judge panel of this court held that Chapter 836's House districting scheme was unconstitutional because it violated the "one person, one vote doctrine under the Equal Protection Clause." *Rural West Tennessee African– American Affairs Council v. McWherter*, 836 F.Supp. 447, 452 (W.D.Tenn.1993), *aff'd sub nom., Millsaps v. Langsdon*, 510 U.S. 1160, 114 S.Ct. 1183, 127 L.Ed.2d 534 (1994).

In November of 1993, the same three-judge panel ruled that Tennessee's "1992 Senate reapportionment plan violate[d] § 2 of the Voting Rights Act by affording black voters in west Tennessee less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Rural West*

*Tennessee African–American Affairs Council, Inc. v. McWherter*, 836 F.Supp. 453, 466 (W.D.Tenn.1993) (*"Rural West I"*). The Supreme Court vacated and remanded the court's *Rural West I* decision, 512 U.S. 1248, 114 S.Ct. 2775, 129 L.Ed.2d 888 (1994), for further consideration in light of *Johnson v. De Grandy*, 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). On remand this court reversed its decision in *Rural West I* and held that the "1992 [Senate] Plan conform[ed] to the Voting Rights Act." *Rural West Tennessee African–American Affairs Council, Inc. v. McWherter*, 877 F.Supp. 1096, 1098 (W.D.Tenn.1995) (*"Rural West II"*), *aff'd sub nom., Rural West Tennessee African–American Affairs Council, Inc. v. Sundquist*, 516 U.S. 801, 116 S.Ct. 42, 133 L.Ed.2d 9 (1995).

While the *Langsdon* and *Rural West I* appeals were pending, the Tennessee General Assembly passed Chapter 536 of the Public Acts of 1994 ("Chapter 536"), which provides a three-part reapportionment plan for Tennessee's House of Representatives, consisting of Plan A and alternative Plans B and C.[2] Plan A creates 12 majority–African– American House districts, but places none in the six county area that plaintiffs describe as rural west Tennessee. Under the terms of Chapter 536, Plan B, which creates 13 majority-African-American House districts, including one in rural west Tennessee, will take effect if this court finds that Plan A unlawfully dilutes minority voting strength.

On January 23, 1995, this court issued an order validating Chapter 536's Plan A after finding that it accorded with the Equal Protection Clause's one person, one vote requirement at issue in the prior *Langsdon* decision. This court further ordered that it would delay consideration of other challenges to Chapter 536's House plan until the Supreme

---

process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b).

**2.** After the Supreme Court affirmed this court's ruling in *Langsdon*, 510 U.S. 1160, 114 S.Ct. 1183, 127 L.Ed.2d 534, Plan C, which called for the reinstatement of the districting plan struck down in *Langsdon*, became moot.

Court ruled on appeals pending in the Senate case (*Rural West I* and *Rural West II*).

After the Supreme Court affirmed *Rural West II*, on January 25, 1996, the Rural West plaintiffs filed a second amended complaint challenging Plan A on the sole ground that it violates § 2 of the Voting Rights Act by diluting the voting power of blacks in Tennessee, including west Tennessee and rural west Tennessee.[3] Contending that *Rural West I* and *Rural West II* conclusively decided the facts necessary to prove that Plan A dilutes minority voting strength in rural west Tennessee, on May 6, 1996, the Rural West plaintiffs filed a motion for summary judgment on their § 2 dilution claim. In response, defendants filed cross-motions for summary judgment, similarly based on the court's prior findings, and specifically contended that: (1) Shelby County should be considered when the court engages in proportionality[4] analysis, and (2) once Shelby County is included in the court's frame of reference, the number of majority-African-American districts is substantially proportional to the black voting age population's share of the total population in the relevant seven-county area.

For the reasons set forth in its July 9, 1998 order, this court limited its geographic frame of reference for relevant statistical data to the six-county area of rural west Tennessee that includes Fayette, Hardeman, Haywood, Lauderdale, Madison, and Tipton counties.[5] This six-county area is covered by five House districts, all of which are majority white.[6] Noting the absence of a detailed analysis of Tennessee's most recent state legislative elections, the court denied all motions for summary judgment. *See Langsdon v. Darnell*, 9 F.Supp.2d 880 (W.D.Tenn.1998). On August 26, 1998, the court held a trial on the merits on the plaintiffs' consolidated claim of vote dilution.

## II. *Rural West I and Rural West II*

As referenced above, in *Rural West I* and *Rural West II*, a three-judge panel of this court considered whether Tennessee's Senate districting scheme violated § 2 of the Voting Rights Act. To determine whether the Senate plan diluted black voting strength, the *Rural West I* and *Rural West II* courts focused upon Shelby County and the same rural, six-county area as in the matter at bar. *Rural West I*, 836 F.Supp. at 455. Because both plaintiffs and defendants substantially rely upon the factual findings and rationale of these two decisions, the court is compelled to review them.

Although the Supreme Court vacated *Rural West I*'s finding of vote dilution with instructions to reconsider in light of *Johnson v. De Grandy*, 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994), the *Rural West II* court, on remand, reinstated its prior findings of fact from *Rural West I* before reevaluating its earlier decision. *See Rural West II*, 877 F.Supp. at 1099 ("We note at the outset that we believe all of our factual findings in *Rural West I* to be correct...."). As a result, the court first turns to the factual findings of *Rural West I*.

---

3. Because the second amended complaint contained no constitutional claims, the three-judge court disbanded itself by order entered May 9, 1996.

4. Under the Voting Rights Act, proportionality is "defined as the relationship between the number of majority-minority voting districts and the minority group's share of the relevant population...." *Johnson v. De Grandy*, 512 U.S. 997, 1025, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (O'Connor, J., concurring).

5. The black voting age population of this six-county area is 31.01%. *See* Pls.' Second Request for Judicial Notice (1990 Census Data), No. 92–2407, Docket Entry No. 29, at p. 2 (June 24, 1992) (hereinafter "Pls.' Second Request for Judicial Notice").

6. Under Plan A, five majority-white House districts include the six counties of rural west Tennessee in the following manner: House District 72 contains a substantial part of Madison County; House District 73 is located entirely within Madison County; House District 80 includes portions of Fayette and Hardeman Counties; House District 81 includes part of Fayette County and all of Tipton County; and House District 82 includes part of Hardeman County and all of Haywood and Lauderdale Counties. *See* Notice of Filing Chapter 536 of the Public Acts of 1994 and Other Related Documents; District Statistics Report of Chapter 536 of the Public Acts of 1994, No. 92–2407, Docket Entry No. 129 (Jan. 25, 1994) (hereinafter "Notice of Filing Chapter 536").

The *Rural West I* court initially determined that the plaintiffs easily satisfied the first two preconditions for success on a vote dilution claim as set forth in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).[7] Turning to the third *Gingles* precondition, "based solely upon the black-white state legislative elections in west Tennessee," the court found a "high level of white bloc voting which usually enables the majority to defeat the black community's candidate of choice."[8] *Rural West I*, 836 F.Supp. at 457–58. In reaching this conclusion, the court made specific findings concerning seven state legislative elections in the same rural six county area at issue in the instant matter:

> In six of the seven rural county elections there was voter polarization based upon race, and in five of the elections the level of polarization was overwhelming. White support of black candidates was particularly low, with only one black candidate receiving more than 10% of the white vote. No black candidate won any of the state legislative elections held in rural west Tennessee.

*Id.* at 457.

The court indicated several reasons why the white-white elections were less probative than black-white contests. Evidence showed that blacks were discouraged from running in majority-white districts because high white cohesion made a black candidacy futile. *Id.* at 459. In addition, past discrimination had denied blacks the valuable benefits of incumbency. The court also noted that in at least half of the elections in which the black preferred candidate won, that candidate was also overwhelmingly supported by whites, indicating that only one viable candidate existed. *Id.* at 459. In light of all these factors, and the absence of evidence showing whether any candidates in the white-white elections were sponsored by the black community, the court found that "in Tennessee black-white elections are more probative of racial bloc voting than are white-white elections, and that black-white elections indicate white bloc voting which usually enables the majority to defeat the black community's candidate of choice." *Id.* at 460.

Having found the three *Gingles* preconditions satisfied, the court, as required by § 2 of the Voting Rights Act, then examined the totality of the circumstances to determine whether the Senate districting plan gave "west Tennessee black voters 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Id.* at 460. Applying the list of factors set out in the Senate Report on the 1982 amendments to the Voting Rights Act,[9] the *Rural West I*

---

7. In *Gingles,* the Supreme Court hold that plaintiffs must at a minimum satisfy the following three-part test before a court may inquire further into their voting rights claim:

   1. The plaintiffs must demonstrate that the protected group in sufficiently large and geographically compact that it could constitute an effective majority in a single-member district.
   2. The plaintiffs must show that the protected group is politically cohesive.
   3. The plaintiffs must show that the majority votes sufficiently as a bloc to enable it usually to defeat the protected group's preferred candidate.

   478 U.S. at 51, 106 S.Ct. 2752.

8. A black-white election refers to an election where at least one candidate was black and at least one was white.

9. The Senate Report factors that are relevant to the evaluation of the totality of the circumstances under the Voting Rights Act are:

   1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
   2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
   3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
   4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
   5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
   6. whether political campaigns have been characterized by overt or subtle racial appeals;

court initially found strong evidence of the second Senate Report factor from its earlier findings regarding significant polarized voting in black-white state legislative elections. The court then found that "in west Tennessee there is a history of official discrimination against blacks in voting which has present-day effects, and that official discrimination in voting is not entirely in the past." *Id.* at 461. In reaching this finding, the court again made rather lengthy observations specific to the rural six-county area at issue in the ·instant case:

> More recently, the political gains by black citizens during the civil rights movement of the 1950's and 60's were accompanied by increased official discrimination in voting. Government officials manipulated voter registration requirements to discourage black voters, and supported or initiated physical and economic intimidation of those blacks who did manage to register. The strongest example of economic intimidation was the eviction of more than 400 black sharecropping families, most of them in Fayette County, after the 1960 election. These evictions were made possible by registrars who would inform sheriffs of the names of blacks who had registered to vote; the sheriffs would then inform white landowners who would evict black tenants who had registered. These mass evictions led to the formation of two "tent cities" for displaced sharecroppers, one in Fayette County and one in Haywood County. The tent cities became national symbols of the struggle of west Tennessee blacks for equal access to the polls.
>
> Although overt official discrimination against black voters has declined significantly since the 1960's, at least one federal court has found evidence of intentional discrimination against black candidates and voters in west Tennessee. In *Taylor v. Haywood County,* 544 F.Supp. 1122 (W.D.Tenn.1982), the district court en-

joined Haywood County from changing its Board of Highway Commissioners election system from district elections to a county-wide at-large election. The court found that the change in the number of districts from 10 to 9, which necessitated the change to an at-large election scheme, was "a result of the purposeful intention to dilute black voting strength in Haywood County, Tennessee." *Id.* at 1131. In Hardeman County in 1983 a lawsuit was filed against the City of Bolivar challenging an amendment to the City Charter providing for a mayoral runoff election if no mayoral candidate received a majority of the votes. *Bills v. Alexander,* Civ.Act. No. 83–1220 (W.D.Tenn.). The plaintiffs alleged that the City had amended its Charter in response to the success of two black candidates for mayor in 1981. The district court approved a class action settlement setting up a new "system which will ensure the opportunity of black citizens of Bolivar to meaningfully participate in the political process." These cases challenging newly adopted election systems indicate to the court that official discrimination against blacks in voting is not entirely a thing of the past in west Tennessee.

*Id.* at 460–61. Because the Senate Report recognizes that "educational and economic disadvantages can translate into political disadvantage," the *Rural West I* court also examined those factors and concluded that black citizens in west Tennessee are more likely than white citizens "to live in poverty, to be unemployed, and to live in substandard housing." *Id.* at 461. Additionally, "[b]lack citizens are less likely to have completed high school, to own their own homes, to have access to a car, or to have telephones in their homes." *Id.* at 461–62.

With these findings in mind, the *Rural West I* court then measured the proportionality of black representation in the Senate

7. the extent to which members of the minority group have been elected to public office in the jurisdiction;

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

9. whether the policy underlying the state or political subdivision's use of the challenged voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *See Gingles,* 478 U.S. at 36–37, 44–45, 106 S.Ct. 2752 (quoting S.Rep. No. 417, 97th Cong., 2d Sess. (1982) at 28–30, reprinted in 1982 U.S.C.C.A.N. 177, at 206–08).

districting plan. Using statewide statistics, the court determined that because majority-black Senate districts constitute only 9.1% of total Senate districts, and because no black candidate had ever won a seat in a majority-white district, Tennessee African–Americans, who constitute 14.4% of Tennessee's voting-age population, were unlikely to achieve electoral success in the state senate equal to their proportion of the Tennessee voting age population without an additional majority-black Senate district. *Id.* at 463. While recognizing that "the level of black electoral success is merely a factor to be considered, and that blacks are not guaranteed proportional representation by § 2," the *Rural West I* court ultimately concluded that the totality of circumstances warranted a finding of unlawful black vote dilution in Tennessee's Senate districting scheme. *Id.* at 463, 466. The Supreme Court vacated this holding and instructed the three-judge panel to reconsider its analysis in light of the Court's recent decision in *De Grandy,* 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775.

On remand, the *Rural West II* court concluded that the plaintiffs still satisfied all three *Gingles* preconditions and several Senate factors for the same reasons set forth in *Rural West I.* However, *Rural West II* nonetheless reversed the court's earlier finding of black vote dilution in Tennessee's Senate reapportionment plan. *Rural West II,* 877 F.Supp. at 1111. Central to the court's decision was its conclusion, based upon *De Grandy,* that proportionality is not the absolute measure of voting equality.[10] Rather, because "the phrase 'elect representatives of their choice' may be read as meaning having the ability to influence the outcome of an election," a minority group's ability to influence elections is also critical to a determination of whether that minority's voting strength has been diluted by a particular reapportionment scheme. *Id.* at 1103. As the *Rural West II* court explained, because a "minority population that votes as a bloc (as required by the second *Gingles* precondition) and comprises at least 25% of the voting-age

population in an electoral district will have significant influence on candidates in virtually every election," a minority group gains sufficient influence within a district for recognition under § 2 when the minority composes 25% to 55% of the voting-age population in the district. *Id.* at 1104–05. The *Rural West II* court, therefore, decided to forego particularized inquiries into racial polarization, the outcomes of individual elections, and the ability of black voters to build coalitions within individual districts and, instead, established a bright-line rule that made any district with a black voting-age population between 25% and 55% an influence district for totality of the circumstances analysis under the Voting Rights Act.

With the new-found relevance of influence districts in the calculus of the totality of the circumstances, the three-judge panel determined that it had overemphasized the importance of proportionality in its earlier decision and decided that the particular combination of majority-black districts and influence districts in the 1992 Senate Plan precluded a § 2 violation. *Id.* at 1108–09. In essence, the inclusion of influence districts in the court's analysis compensated for the otherwise detrimental absence of proportionality. *See id.* at 1109 ("Were there no influence districts included in the 1992 Plan, the lack of proportionality in this case combined with other factors would be sufficient to find that § 2 had been violated."). The *Rural West II* court, however, was careful "not [to] imply that the legislature could adopt a plan under current circumstances with no majority-minority districts at all if it created a sufficient number of influence districts [because] [u]nder current doctrine, the facts in this case require some majority-minority districts." *Id.* at 1107 n. 11.

In determining that the Senate plan did not dilute black voting strength, the *Rural West II* court focused upon statewide data, but considered a regional frame of reference as well. On the statewide level, where blacks comprise 14.4% of the voting-age population,

---

10. *See De Grandy,* 512 U.S. at 1020, 114 S.Ct. 2647 ("[T]he degree of probative value assigned to proportionality may vary with other facts."); *see also id.* at 1026, 114 S.Ct. 2647 (O'Connor, J.,

concurring) ("In sum, the Court's carefully crafted approach treats proportionality as relevant evidence, but does not make it the only relevant evidence.").

the three majority-black districts and the three influence districts combined to constitute 18.2% of Tennessee's thirty-three Senate districts. At the seven-county, regional level, where blacks comprise 37.9% of the voting-age population, the area's two majority-black districts and two influence districts combined to constitute 50% of the eight districts at least partially included in the region. The court therefore found that under either geographic scope, the combination of majority-black districts and influence districts, under the totality of the circumstances, precluded a finding of black vote dilution. *See id.* at 1110 ("In sum, a consideration of the seven-county region alone does not change the outcome of our decision today.").

### III. *Analysis*

#### A. *The Gingles Factors*

With the saga of the prior litigation summarized, the court turns to the present action. The parties have stipulated that blacks in rural west Tennessee are sufficiently numerous and geographically compact to satisfy the first *Gingles* precondition. Additionally, revised stipulation # 19 in the parties' revised stipulations of facts states that black voters in rural west Tennessee are politically cohesive. Thus, the parties agree that the first two *Gingles* preconditions are met.

There is a dispute, however, over the third precondition—whether white bloc-voting usually defeats the minority-preferred candidate. The dispute arises due to the parties' differing opinions concerning the proper scope of the court's inquiry. Plaintiffs seek to emphasize legislative elections involving candidates of different races. Defendants, on the other hand, believe the court should give equal weight to elections involving only white candidates, and should examine other elections held at the county level not involving the state legislature.[11]

An examination of past election results shows that the court's resolution of this scope issue has the potential of being outcome determinative. The plaintiffs' expert, Dr. Cole, analyzed eleven black-white legislative elections and found the black preferred candidate lost nine (82%) of those contests. The results of the defendants' experts, Dr. Gant and Dr. Lyons, is similar for black-white legislative contests. They found minority vote dilution in nine of ten (90%) elections.[12] Thus, if the court were to limit its examination to black-white legislative contests, it is clear that the third *Gingles* precondition would be satisfied.

The inclusion of white-white legislative contests blurs the result somewhat. The defendants' experts found that the preferred candidate of blacks was defeated 52.38% (11 of 21) of the time in all legislative elections from 1986–1994.[13] Therefore, if the court were to weigh black-white and white-white elections equally, the black preferred candidate is usually defeated, but a difference in one election would change that result.

To increase the amount of data available, the defendants' experts further widened their analysis to include county-wide elections from 1986–1996. For black-white contests during that time period, they found the black preferred candidate was defeated 13 out of 24(54%) times. For white-white county-wide elections, the black preferred candidate lost 6 out of 26(23%) times. Therefore, if the court were to give these elections equal weight, the total would show the black preferred candidate losing 18 out of 50(36%) county-wide elections.

If all of the county-wide elections are combined with all of the legislative elections and given equal weight, the results show the

---

11. The parties have referred to the legislative contests as endogenous elections, and the other elections as exogenous. For sake of convenience, the court will adopt these labels.

12. Unlike Dr. Cole, the defendants' experts did not analyze the 1974 House District 73 election. Of the elections analyzed by both sides' experts, the only difference centered around the 1988 three-way election for Senate District 26. While Dr. Cole's calculations indicate that African-

Americans preferred the elected candidate, the numbers of Dr. Gant and Dr. Lyons show that the plurality of blacks voted for a defeated candidate. All of the experts agreed that this difference was probably due to differences in statistical calculation methods.

13. Dr. Cole did not analyze white-white elections prior to 1994. His post-1994 results mirrored those of Drs. Lyons and Gant.

black preferred candidate losing 29 of the 71(41%) elections. It is evident, therefore, that the court's decision as to whether whites generally vote as a bloc to defeat the black preferred candidate will turn on how much weight the court affords the white-white and exogenous elections.

Prior case law has provided some guidelines but no firm dictates on the question. The Sixth Circuit has clearly indicated that a court must at least consider elections involving only white candidates. *See Cousin v. Sundquist*, 145 F.3d 818, 825 (6th Cir. 1998). This does not mean, however, that a court should be blind to the race of candidates. As the Sixth Circuit noted in *Clarke v. City of Cincinnati*, 40 F.3d 807 (6th Cir. 1994), § 2's "guarantee of equal opportunity is not met when ... 'candidates favored by blacks can win, but only if the candidates are white.'" 40 F.3d at 812 (quoting *Smith v. Clinton*, 687 F.Supp. 1310, 1318 (E.D.Ark. 1988) (three-judge panel)). In fact, *Cousin* implicitly recognizes that races involving only white candidates, while relevant, are not typically as relevant as black-white elections.

> [W]e do not foreclose the consideration of electoral races involving only white candidates where the record indicates that one of the candidates was strongly preferred by black voters.... Where black voters have a genuine candidate of choice in an election involving only white candidates, then the results will be relevant to the question of whether racial bloc voting enables the white majority usually to defeat the minority's preferred candidate.

*Cousin*, 145 F.3d at 825 (quoting *Nipper v. Smith*, 39 F.3d 1494, 1540 (11th Cir.1994) (en banc)). In *Cousin*, the Sixth Circuit made it clear that it does not expect all white-white elections to be relevant, but where the record indicates they are, the district court must consider them. Therefore, while a court in this circuit must consider white-white elections, it should place primary reliance on the elections involving a minority candidate.

This understanding of *Cousin* and *Clarke* parallels the decisions of most of the other circuits that have dealt with this issue. As indicated above, the Eleventh Circuit in *Nipper* noted that white-white elections can be relevant. However, the court specifically held that "the most probative evidence of whether minority voters have an equal opportunity to elect candidates of their choice is derived from elections involving black candidates." *Nipper*, 39 F.3d at 1540; *see also Davis v. Chiles*, 139 F.3d 1414, 1417 n. 5 (11th Cir.1998) (noting that while analysis of white-white elections is relevant, evidence from black-white elections is more probative). Similarly, the Fifth Circuit has "consistently held that elections between white candidates are generally less probative in examining the success of minority-preferred candidates ... [because] such elections do not provide minority voters with the choice of a minority candidate." *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 864 (5th Cir.1993) (en banc). This view predominates in the other circuits as well. *See, e.g., Uno v. City of Holyoke*, 72 F.3d 973, 988 n. 8 (1st Cir.1995) ("Although the VRA does not require for a successful section 2 showing that minority-preferred candidates be members of the minority group, elections in which minority candidates run are often especially probative on the issue of racial bloc voting.") (citations omitted); *Jenkins v. Red Clay Consol. School Dist. Bd. of Educ.*, 4 F.3d 1103, 1128 (3d Cir.1993) ("As a general matter, we believe that elections involving white candidates only are much less probative of racially polarized voting than elections involving both black and white candidates."). In fact, at trial all of the experts agreed that black-white elections are the most relevant.

The problem, of course, is that neither case law nor science provides the court with an objective way to weigh white-white elections against black-white elections. The court is therefore left to assess the relevance of each type of election on a case-by-case basis. In some exceptional cases, the evidence may show that certain white-white elections should be given substantially equal weight because one of the candidates was openly sponsored or endorsed by the African-American community. Additionally, where the sample size of black-white elections is particularly small, it may be necessary to place substantial reliance on the white-white races. On the other hand, if the record contains

results from numerous black-white elections, relying heavily on white-white elections may distort the picture, not complete it. This is especially true where, as in this case, the level of white cohesion in the legislative contests increases dramatically from 59% in white-white elections to 86% in black-white elections. This increase in cohesion, which all of the experts acknowledged, shows that when a black candidate is in a race, whites are even more likely to vote as a bloc to defeat the black preferred candidate.[14] "When white bloc voting is 'targeted' against black candidates, black voters are denied an opportunity enjoyed by white voters, namely, the opportunity to elect a candidate of their own race." *Clarke*, 40 F.3d at 812. Although the court is cognizant of the Supreme Court's reminder that "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground," *De Grandy*, 512 U.S. at 1020, 114 S.Ct. 2647, a reading of the third *Gingles* factor which allows whites to block minorities from electing any preferred candidate of their own race is not a guarantee of equal opportunity. According to the experts, in about 90%[15] of the black-white legislative races, the black candidate received a majority or plurality of black votes. In each of these contests, the black-preferred black candidate lost. This evidence of white bloc voting directed specifically at black candidates leads the court to conclude that it should place primary emphasis on the results of the black-white contests.[16]

It is also necessary to determine what weight to give the county-wide exogenous elections. The parties stipulated that the legislative elections were the most legally significant. Considering that the court has before it evidence from twenty-one legislative elections that date as far back as 1976 and exhibit consistent results, the need for exogenous elections is questionable at best. *See, e.g., Clark v. Calhoun County*, 21 F.3d 92, 97 (5th Cir.1994) ("[E]lections involving the particular office at issue will be more relevant than elections involving other offices.") (citation omitted); *Cf. Jenkins*, 4 F.3d at 1134 (permitting use of exogenous elections where endogenous evidence is scarce); *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 502 (5th Cir.1987) ("Although exogenous elections alone could not prove racially polarized voting ... the district court properly considered them as additional evidence of bloc voting—particularly in light of the sparsity of available data."). Because of the prevalence of endogenous data, the court does not find the exogenous elections to be particularly useful or necessary. Certainly, "the voting patterns in exogenous elections cannot defeat evidence, statistical or otherwise, about [endogenous] elections...." *Cofield v. City of LaGrange, GA*, 969 F.Supp. 749, 773 (N.D.Ga.1997).[17]

Having determined that black-white legislative contests deserve the most weight, the court concludes that the third *Gingles* precondition is satisfied. According to the experts, in these interracial legislative elections white bloc voting defeats the minority-preferred candidate at least 82% of the time. In light of its limited probativeness, the white-white and exogenous evidence is simply insufficient to overcome the overwhelming evidence garnered from the most relevant

---

**14.** This court acknowledges that a black candidate is not always the black-preferred candidate. However, it refuses to ignore the reality that many voters tend to vote along racial lines. The evidence in this case is consistent with that reality.

**15.** Drs. Lyons and Gant analyzed ten interracial contests and found blacks supported the black candidate in nine of those races. Dr. Cole analyzed eleven interracial elections and concluded that blacks supported the black candidate in nine of those contests.

**16.** As the court noted in *Rural West I*, blacks may be discouraged from running because they see a black candidacy in a majority white district as a futile gesture. *Rural West I*, 836 F.Supp. at 459. This prevents the black community from sponsoring and electing their preferred candidate. Thus, "[i]t would not make sense to allow data from white-white elections in majority-white districts, in which potential black candidates viewed black candidacies as futile, to overcome evidence of white bloc voting in black-white elections in districts in which black candidates felt they stood a fighting chance." *Id.*

**17.** While the defendants' experts performed analysis on both endogenous and exogenous elections, they testified that exogenous elections are of limited value.

black-white legislative elections. The court therefore holds that the plaintiffs have made a showing sufficient to satisfy the third *Gingles* precondition.

### B. *Totality of the Circumstances*

■ As the three *Gingles* factors are necessary but not sufficient proof of vote dilution, the court must now evaluate the totality of the circumstances in rural west Tennessee. In performing this inquiry, the court follows *De Grandy*'s admonition that "[n]o single statistic provides courts with a short-cut to determine whether a set of single-member districts unlawfully dilutes minority voting strength." *De Grandy,* 512 U.S. at 1020–21, 114 S.Ct. 2647.[18]

The court turns first to the factors listed in the Senate Report to the 1982 amendments.[19] In doing so, the court recognizes that these factors are not exclusive determinants and the court remains free to consider such other evidence as it deems relevant. *See De Grandy,* 512 U.S. at 1010–11, 114 S.Ct. 2647. Based on the totality of the circumstances, the court finds that Chapter 536 violates § 2 of the Voting Rights Act by affording African–Americans in rural west Tennessee less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice.

### 1. *Lack of Electoral Success and Polarized Voting*

The Supreme Court has stated that the most important Senate Report factors bearing on a § 2 violation are the extent to which minority group members have been elected to public office in the jurisdiction and the extent of racial polarization in voting. *See Gingles,* 478 U.S. at 51 n. 15, 106 S.Ct. 2752. Both of these factors were mentioned above but each deserves further development as part of the court's totality of the circumstances analysis.

Although eleven of the legislative elections analyzed by the experts had a black candidate, not one African–American was elected to the state legislature from the six-county area.[20] The court finds this evidence very compelling. Black candidates fared slightly better in the exogenous county-wide elections. Out of twenty-four elections which included a black candidate, seven blacks were elected. Even that amount of success is slightly misleading, however, because in two of those victories there were multiple white candidates which split the white vote and allowed the African–American to win. Additionally, the success of blacks at the county level does not equate with success at the state level. The court finds that the overall lack of success of black candidates weighs heavily in favor of a finding of vote dilution.

The extent of racially polarized voting also counsels a finding of vote dilution. Because blacks are a minority in all the House districts in rural west Tennessee, if voting is polarized blacks will generally be unable to elect representatives of their choice. All of the experts at trial agreed that voting is polarized. The numbers of the defendants'

---

**18.** The *De Grandy* Court further explained that: "[T]here is no indication that Congress intended to mandate a single, universally applicable standard for measuring undiluted minority voting strength, regardless of local conditions and regardless of the extent of past discrimination against minority voters in a particular State or political subdivision."
*De Grandy,* 512 U.S. at 1021 n. 17, 114 S.Ct. 2647 (quoting *Gingles,* 478 U.S. at 94–95, 106 S.Ct. 2752 (O'Connor, J., concurring)). The amorphous nature of this totality of the circumstances inquiry has led to criticism to which this court is sympathetic. *See Barnett v. City of Chicago,* 141 F.3d 699, 702 (7th Cir.1998) (Posner, Chief Judge) ("Section 2 unfortunately provides no guidance on how to balance the factors and thus determine whether a challenged plan needlessly impairs a minority group's voting power. The statute tells the courts to consider 'the totali-

ty of the circumstances,' and that has turned out to be, if anything, worse than useless advice, as it has discouraged the Supreme Court from trying to particularize the standard.") (citation omitted); *Uno v. City of Holyoke,* 960 F.Supp. at 515, 518 (D.Mass.1997) ("[T]he Voting Rights Act and its interpretative decisional authority offer awkward tools for such a delicate job. Applying this cumbersome, almost paradoxical statute in such an important area is analogous to performing heart surgery with a butter knife.").

**19.** For a listing of the factors see, *supra,* note 9.

**20.** The House districts which are located in the six-county area have the following black voting age populations: District 72—10%; District 73—37%; District 80 and District 81—29%; District 82—41%.

own experts show that voting was polarized in 90% of the black-white legislative elections. Even when the white-white legislative elections are included in the calculation, 71% of the elections show racial polarization.[21] Thus, in the two areas noted by the Supreme Court to be most important in the totality of the circumstances analysis, minority electoral success and voter polarization, the evidence strongly supports a finding of vote dilution. *See Clark v. Calhoun County,* 88 F.3d 1393, 1398 (5th Cir.1996) (finding black vote dilution and explaining that "[i]n short, the presence of racially polarized voting and the virtually complete absence of black elected officials in county offices provides striking evidence of vote dilution in Calhoun County"); *Harvell v. Blytheville School District # 5,* 71 F.3d 1382, 1390 (8th Cir.1995) (explaining that in finding vote dilution "[t]he two primary factors considered in our totality analysis are the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme.").

### 2. *Prior Discrimination*

The *Rural West I* court made specific findings regarding the history of official discrimination in voting in western Tennessee. This court takes judicial notice of those findings. *See Hastert v. State Bd. of Elections,* 777 F.Supp. 634, 650 (N.D.Ill.1991).[22] The Sixth Circuit in *Cousin* indicated that general accounts of past discrimination should not garner much weight where the most recent "30 years have been marked by a complete absence of official discrimination against blacks' voting rights...." *Cousin,* 145 F.3d at 832. However, while the *Rural West I* court recounted numerous official acts of discrimination from the more distant past, including slavery and Reconstruction, it also made

clear that there have been voting rights violations by public officials in rural west Tennessee as late as the 1980's. *Rural West I,* 836 F.Supp. at 461. Official discrimination not only prevents blacks from electing representatives of their choice, it also leads to disillusionment, mistrust, and disenfranchisement. These feelings last beyond the current election, and can cause black voters to drop out of the political process and potential black candidates to forgo an election run.

Moreover, the court in *Rural West I* found that blacks suffered the effects of discrimination in such areas as education, employment, and health.

> In west Tennessee, black citizens are more likely than white citizens to live in poverty, to be unemployed, and to live in substandard housing. Black citizens are less likely to have completed high school, to own their own homes, to have access to a car, or to have telephones in their homes. As the Senate Report recognizes, educational and economic disadvantages can translate into political disadvantage.

*Id.* at 461–62. Money has a prominent role in American politics. Campaigning is expensive and all candidates are aware of the need to raise money. Financed electorate groups can exert influence by sponsoring their own candidate or gaining the ear of another through contributions. The economic and educational isolation of African–Americans described by the *Rural West I* court limits their ability to fund and mount political campaigns. In this sense therefore, blacks are not able to equally participate in the political process.

### 3. *Responsiveness of Public Officials*

The defendants offered the testimony of Representative Page Walley (District 80) and

---

21. The court notes further that even if the analysis also included all of the exogenous elections, polarized voting occurred in 62% of the contests.

22. *Hastert* was a congressional districting case. The three-judge district court considered the court of appeals' findings of historical discrimination against Hispanics in a prior municipal districting case because "the proposed Hispanic majority congressional district [was] essentially coterminous with the Hispanic community and population discussed [in the prior court of appeals case]." Specifically, the *Hastert* court reasoned:

> This judicially recognized history of discrimination, both past and present, against the Chicago Hispanic community and its attendant impact on effective political participation and representation, as evidenced in [the prior court of appeals case], satisfies this court that a Hispanic majority district is warranted under *Gingles.*

*Hastert,* 777 F.Supp. at 650.

Representative Matt Kisber (District 73) to show the responsiveness of the Tennessee House of Representatives to the needs of minorities. Each legislator cited numerous initiatives taken in his district as a result of appropriations directed towards helping the minority community. They also noted that African–Americans hold various leadership positions within the House. Furthermore, both Representatives indicated that they campaign vigorously in African–American communities and are cognizant of their need for support from those communities. The court believes that this testimony shows that the Tennessee House of Representatives is aware of the need to be responsive to the black community.

#### 4. State Policy Underlying the Districting Plan

The state has argued that it has a policy underlying the present districting scheme which is not tenuous. Specifically, it argues that the lack of a majority black district in rural west Tennessee results from the state's desire to prevent the fracturing of certain cities, and in particular Jackson, into different districts. Maintaining municipal boundaries is a legitimate criteria to consider when drawing district lines. However, the House District Maps submitted by the state make it clear that Jackson is already split under the current plan. Thus, any further splitting of Jackson required by Plan B would be a change in degree, not in kind. In addition, the state's interest in maintaining municipal boundaries is simply insufficient alone to overcome the other factors discussed.

#### 5. Miscellaneous Senate Report Factors

The court will briefly mention the remaining Senate Report Factors. No evidence was presented to show that the state uses suspect electoral practices or procedures, such as unusually large districts or majority vote requirements. There was also no evidence of overt or subtle racial appeals in political campaigns. Finally, there is not a slating process or other mechanism used in state legislative contests to prevent minority candidacies.

#### 6. Proportionality

" 'Proportionality' . . . links the number of majority-minority voting districts to minority members' share of the relevant population." De Grandy, 512 U.S. at 1014 n. 11, 114 S.Ct. 2647. The black voting age population in the six-county region relevant to the case at bar is 31.01%. Therefore, if proportionality existed, approximately 31% of the House districts in rural west Tennessee would include a majority black population. As noted above, however, none of the five House districts that include the six-county area are majority black.

The Supreme Court has clearly held that proportionality is not a determinative factor but is properly considered as part of the totality of the circumstances. See id. at 1020, 114 S.Ct. 2647 ("[T]he degree of probative value assigned to proportionality may vary with other facts."); see also id. at 1025, 114 S.Ct. 2647 ("The [majority] opinion's central teaching is that proportionality . . . is always relevant . . . but is never itself dispositive.") (O'Connor, J., concurring).

In De Grandy, the Court found that the district court erred in finding that dilution was present because the state had failed to maximize the number of majority-minority districts. Id. at 1022, 114 S.Ct. 2647. As the Court explained, the substantial proportionality[23] between the percentage of majority-Hispanic districts and the Hispanic voting-age population in Dade County demonstrated that Florida's new districting scheme would "thwart . . . not encourage or perpetuate" Dade County's tendency to exclude Hispanics from the political process. Id. at 1014, 114 S.Ct. 2647. Considering the existence of substantial proportionality, the Supreme Court deemed the district court's ordering of an additional majority-Hispanic district in Dade County an improper maximization of majority-Hispanic districts. Id. at 1016, 114 S.Ct. 2647 ("[R]eading the first Gingles condition in effect to define dilution as a failure to maximize in the face of bloc voting . . .

---

**23.** Substantial proportionality exists when the legislature has created the maximum number of majority-minority districts possible without ex-

ceeding proportionality. See De Grandy, 512 U.S. at 1013–15, 114 S.Ct. 2647.

causes its own dangers, and they are not to be courted.").

The circumstances in rural west Tennessee clearly contrast those in Dade County. The substantial proportionality that precluded a finding of vote dilution in *De Grandy* is simply not present in rural west Tennessee where no majority-black district exists. Considering that the black voting-age population of rural west Tennessee is 31.01%, the requirement of a majority-black district in that area, which would make only 20% of the House districts in that area majority-black, ought not be viewed as an improper attempt to maximize majority-minority districts, but as a minimal requirement for the political equality of black voters in that six-county area.[24]

### 7. Influence Districts

Because four of the five House districts that are at least partially included in the six-county area of rural west Tennessee have African–American voting-age populations in excess of 25%, *Rural West II* requires the court to label those four districts as "influence districts" and consider them in its examination of the totality of the circumstances as well. *See Rural West II*, 877 F.Supp. at 1106–07 (requiring inclusion of influence districts in evaluation of the totality of circumstances). Sensing that the inclusion of influence districts in the totality of circumstances of rural west Tennessee endangers their claim of vote dilution,[25] plaintiffs argue that the unique circumstances of the instant case deem the existence of influence districts in rural west Tennessee irrelevant and cite footnote 11 of *Rural West II* to support their position.

Footnote 11 cautions:

We do not imply that the legislature could adopt a plan under current circumstances with no majority-minority districts at all if it created a sufficient number of influence districts. Under current doctrine, the facts in this case require some majority-minority districts.

*Id.* at 1107 n. 11. From this notation, plaintiffs extrapolate that the relevance of influence districts in the evaluation of the totality of circumstances, as seen in *Rural West II*, is not triggered until the defendants demonstrate that at least "some majority-minority districts" exist in the challenged region. Relying on this premise, plaintiffs contend that because no majority-black districts exist in the challenged six-county area, the presence of influence districts in rural west Tennessee should have no relevance in the instant case.

The court, however, must reject plaintiffs' understanding of the relevance of influence districts in this case. *Rural West II* did not purport to set forth any limitation on the consideration of influence districts in the totality of the circumstances of discrete regional claims of vote dilution. Rather, the context of footnote 11 reveals that the *Rural West II* court was simply stating that Tennessee's statewide Senate districting scheme must contain some majority-black districts. Accordingly, as required by the holding of *Rural West II*, the court will weigh the presence of rural west Tennessee's four influence districts in its evaluation of the totality of circumstances.

However, the precise probative value of influence districts, like any other consideration in a vote dilution claim, depends upon the totality of circumstances. *Cf. De Grandy*, 512 U.S. at 1020, 114 S.Ct. 2647 ("[T]he

24. As this court noted in its order denying summary judgment, statistics from the relevant region, as opposed to state-wide calculations, are the most probative when examining proportionality. *See Langsdon*, 9 F.Supp.2d at 885–86. However, the court notes that with the creation of an additional black majority district, the statewide percentage of majority-minority districts will rise from 12.12% to 13.13%. At the statewide level, black voters comprise 14.4% of the voting-age population. Thus, even on a statewide level, the creation of an additional majority-minority district would not exceed substantial proportionality.

25. Indeed, it was the consideration of influence districts in *Rural West II* that saved Tennessee's Senate plan from violating § 2 of the Voting Rights Act, despite the plaintiffs' satisfaction of the *Gingles* factors, proof of several Senate Report factors, and demonstration of no proportionality. *See Rural West II*, 877 F.Supp. at 1106–07, 1111 ("Nonetheless, were we still prevented from recognizing the existence of influence districts, we would reinstate our previous holding.").

degree of probative value assigned to proportionality may vary with other facts."). Although the court disagrees with plaintiffs' contention that rural west Tennessee's influence districts should have no relevance in the matter at bar, the court finds that the absence of a single majority-black district in the six-county region combined with the circumstances discussed above compels this court to attach less probative significance of the area's influence districts.

In reaching this conclusion, the court acknowledges, as noted earlier, the Supreme Court's admonition in *De Grandy* that "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics." *De Grandy,* 512 U.S. at 1020, 114 S.Ct. 2647. The court, however, is also cognizant of the Supreme Court's recognition in *De Grandy* that "manipulation of district lines can dilute the voting strength of politically cohesive minority group members ... by fragmenting the minority voters among several districts where a bloc-voting majority can routinely out-vote them." 512 U.S. at 1007, 114 S.Ct. 2647 (citing *Voinovich v. Quilter,* 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) ("Dividing the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice: If the majority in each district votes as a bloc against the minority candidate, the fragmented minority group will be unable to muster sufficient votes in any district to carry its candidate to victory.")) Without a particularized, and no doubt unwieldy, inquiry into the ability of rural west Tennessee black voters to actually "influence" the political process in the region's specific districts, which *Rural West II* forewent in exchange for a bright light rule,[26] it is extremely difficult to determine at what point the presence of these districts with sufficient minority populations to be labeled an "influence district" truly begin to demonstrate political equality, rather than unlawful minority vote fragmentation.

In balancing the totality of circumstances in rural west Tennessee, however, the court finds guidance from the fact that under both the statewide and regional analysis conducted in *Rural West II,* it was the combination of majority-black districts and influence districts that precluded a finding of black vote dilution. *Id.* at 1106–07, 1110. With no majority-black district in the six-county area, and overwhelming evidence of polarization and white bloc-voting, the situation in rural west Tennessee simply does not replicate the non-diluted combination present in *Rural West II.* Therefore, despite the fact that *Rural West II* labels four of the five House districts included in rural west Tennessee as "influence districts," the totality of circumstances, including overwhelming racial polarization in voting, historical, but aging, official discrimination on the basis of race, the failure to elect a single black candidate to state legislative office, the continuing effects of discrimination in education and employment,[27] and the absence of a single majority-black district in a six-county area that contains a black-voting age population of 31% and includes five House districts, compels this court to find that Plan A of Chapter 536 unlawfully fragments and thereby dilutes black voting strength in rural west Tennessee. The remedy for this Voting Rights Act violation is the creation of a majority-black district in rural west Tennessee.

C. *Compliance with the Voting Rights Act and Racial Gerrymandering*

■ Upon a finding of vote dilution, "it is a fundamental tenet of voting rights law that, time permitting, a federal court should defer in the first instance to an affected state's or city's choice among legally permissible remedies." *Uno,* 72 F.3d at 992. As discussed

---

26. Considering that the Supreme Court affirmed the three-judge panel's decision in *Rural West II* to adopt a standard rule for determining the existence of an influence district, this court is not inclined to revisit *Rural West II*'s decision in that regard. *But see Uno,* 72 F.3d at 990–91 (declining to follow *Rural West II*'s standard rule and opting for a particularized inquiry).

27. *See Stabler v. County of Thurston,* 129 F.3d 1015, 1023 (8th Cir.1997) (affirming that disparate socio-economic status of minority group was causally connected to minority's depressed level of political participation).

above, anticipating the potential for a judicial finding of black vote dilution, the Tennessee legislature constructed a majority-black House district in rural west Tennessee to take effect in the event Plan A violates the Voting Rights Act. The court, of course, is aware that the implementation of Plan B, necessitated by this order, may implicate the Equal Protection Clause of the Fourteenth Amendment. *See Bush v. Vera,* 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (requiring strict scrutiny when race is the predominant factor in the creation of a legislative district); *Shaw v. Hunt,* 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996). However, the court declines to address Plan B's compliance with the Equal Protection Clause at this time as no arguments concerning Plan B have been heard, nor has any party alleged that Plan B constitutes an unconstitutional racial gerrymander.[28]

### IV. *Conclusion*

For the foregoing reasons, the court finds that Plan A of Chapter 536 violates § 2 of the Voting Rights Act because it dilutes African–American voting strength in rural west Tennessee.[29]

---

28. The court notes that the Rural West plaintiffs have not indicated any opposition to Plan B. The amended complaint of the Langsdon plaintiffs alleges that all of Chapter 536, including Plan B, constitutes illegal political gerrymandering. No racial gerrymandering claims are advanced.

29. Because the court finds unlawful vote dilution pursuant to the results test of § 2 of the Voting Rights Act, the court need not address plaintiffs' separate argument of intentional vote dilution set forth in their supporting memoranda.